DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/9/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
                                              :
IN RE WORLD TRADE CENTER LOWER                :
MANHATTAN DISASTER SITE LITIGATION            :
                                              :
                                              :
                                              :
                                              :
                                              :
                                              :
                                              :
                                              :
                                              :
                                              :
-------------------------------------------------------- X

**ORDER AND OPINION
DENYING IN PART AND
GRANTING IN PART
DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT
DISMISSING COMPLAINT**

09 CV 680 (AKH)

21 MC 102 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

In this action, Plaintiff Marek Socha, a licensed asbestos-abatement worker,

asserts claims for common law negligence and violations of sections 200 and 241(6) of the New

York Labor Law. Socha's claims are based upon injuries suffered after working in numerous

buildings in the vicinity of the World Trade Center site in the weeks, months, and years

following the 9/11 terrorist attacks. Socha asserts his claims against various owners, managing

agents, lessees, environmental consultants, and contractors (collectively, "Defendants") that

owned, managed or worked in the buildings.

The Defendants have moved for summary judgment to dismiss the claims against

them. The owners, managing agents, and lessees moving for summary judgment are: Boston

Properties, Inc., 90 Church Street, L.P., 110 Church, LLC, Lionshead 110 Development LLC,

Battery Park City Authority, Merrill Lynch & Co., Inc., 222 Broadway LLC, Crown 61

Associates, LP, Crown 61 Corp., Crown Broadway LLC, Crown Properties, Inc., American

International Realty Corp., American International Realty Group, and various entities I will

1

designate as the "Brookfield Defendants"[1] (collectively, the "Owner Defendants"). The environmental consultants moving for summary judgment are: Ambient Group, Inc., Hillmann Environmental Group, Inc., Weston Solutions, Inc. (collectively, the "Environmental Consultant Defendants"), and Indoor Environmental Technologies, Inc. The only general contractor moving for summary judgment is Structure Tone, Inc. ("Structure Tone"). The only subcontractor moving for summary judgment is Blackmon-Mooring Steamatic Catastrophe, Inc. ("BMS"). For the following reasons, the Defendants' motions are granted in part and denied in part.

## I.  Background[2]

On September 11, 2001, terrorists hijacked American Airlines Flight 11 and United Airlines Flight 175 and crashed the airplanes into the north and south towers of the World Trade Center. Within two hours, both towers collapsed, spewing debris and a large plume of dust into buildings throughout lower Manhattan. The dust plume that penetrated the buildings consisted of a complex mixture of pulverized cement, glass fibers, asbestos, crystalline silica, metals, volatile organic compounds, and other chemicals, some of which were known human carcinogens. *See* Decl. of Gregory J. Cannata in Supp. of Pls.' Opp'n to Defs.' Mots. for Summ. J. ("Cannata Decl."), Exh. 1 at 7; *In re WTC Disaster Site*, 414 F.3d 352, 358 (2d Cir. 2005). The hazard posed by the dust was allegedly due primarily to its high mass concentration, large particulate matter, and high alkalinity with a pH measurement of over 11. *See* Cannata Decl., Exh. 2 at 4, Exh. 8 at 7.

---

[1] The Brookfield Defendants include Brookfield Financial Properties Inc., Brookfield Financial Properties, L.P., Brookfield Properties OLP Co. LLC (f/k/a BFP One Liberty Plaza Co., LLC), Brookfield Properties One WFC Co. LLC (f/k/a WFP Tower A Co. LP), and Brookfield Properties One WFC G.P. Corp. (f/k/a WFP Tower A Co. GP Corp., WFP Tower B Co. L.P., WFP Tower B Co. G.P. Corp., WFP Tower D Co. L.P., and WFP Tower D Co. G.P. Corp.).

[2] The facts stated here are either undisputed or presented in the light most favorable to Socha, as the non-moving party. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Of the buildings at issue here, those located in close proximity to the World Trade Center site suffered moderate to major damage when the World Trade Center towers collapsed, including structural damage and breaches in their façades. *See* Cannata Decl., Exh. 7 at 1-2. Those buildings located further away sustained little to no structural damage. *See id.* However, varying amounts of dust and debris entered all the buildings through open or broken windows, façade breaches, and the ventilation systems, which often circulated the dust throughout the buildings before being turned off. *See, e.g.*, Cannata Decl., Exh. 3 at 147-48, Exh. 4 at 89-92. The amount of settled dust in the buildings ranged from less than an inch to 10 feet. *See, e.g.*, *id.*, Exh. 17A ¶ 4.

Following the 9/11 terrorist attacks, the owners, managing agents, and lessees of the affected buildings retained environmental consultants and contractors to test the dust and air, evaluate the condition of the buildings, and plan the cleaning and renovation. *See, e.g.*, Cannata Decl., Exh. 191. On September 14, 2001, the New York City Department of Environmental Protection ("NYC DEP") issued a letter to owners of buildings affected by the collapse of the World Trade Center towers. That letter indicated that the dust and debris should be tested for asbestos or assumed to be "asbestos-containing material." *See* Goldstein Decl., Exh. D. Further, the NYC DEP required that all "asbestos-containing material" be handled by workers certified as "asbestos handlers." *Id.*

Socha, as a licensed asbestos-abatement worker, was employed by various subcontractors retained to perform the clean-up of the dust and debris at the different buildings. He alleges that the building owners, environmental consultants, general contractors, and subcontractors, treated the cleanup work primarily as an asbestos-abatement project and failed to take account of the dangerous "high-alkaline" dust present in all buildings. *See* Pls.' Master

3

Mem. in Opp'n to Defs.' Mots. for Dismissal of the Pls.' Labor Law Causes of Action ("Pls.' Master Opp'n Br.") at 12-29.  This singular focus, in turn, lead to the use of respiratory equipment and the implementation of safety practices that, while perhaps acceptable for asbestos abatement, failed to protect him from the "high-alkaline" World Trade Center dust. *See id.*; Cannata Decl., Exh. 8 at 11.  More specifically, Socha presents evidence that he wore "asbestos-specific" respirators and was not provided with "powered air purifying respirators." *See* Cannata Decl., Exh. 53 at 170, 217-18, 222, 247-49, 256-59, Exh. 54 at 295, 301, 311, 329, 345, 377. Moreover, Socha points to expert evidence that "asbestos-specific" respirators are prone to clogging when used in environments with "high-alkaline" dust—characterized by large particulate matter—leading to constrained air flow and leakage of contaminated air into the lungs. *See id.*, Exh. 8 at 7.  This problem was allegedly compounded by the occasional unavailability of replacement filters and decontamination units. *See id.*, Exh. 8 at 11.

Over the months and years following Socha's work in the buildings, he has allegedly developed various disorders of the upper and lower respiratory tracts. *See, e.g.*, Pl.'s 56.1 Statement of Disputed Facts Related to 110-120 Church Street ¶¶ 3-5.  Socha contends that the inhalation of highly corrosive "alkaline-based" dust caused these various illnesses and seeks to hold Defendants liable under sections 200 and 241(6) of the New York Labor Law and common law negligence.  Following fact discovery, Defendants moved for summary judgment. Because there are significant differences in the relevant facts pertaining to each building, I address each separately.

## A.    110-120 Church Street

110-120 Church Street is located two blocks north of the World Trade Center site. On September 11, 2001, the property was owned by 110 Church LLC, which had leased the

4

property to Lionshead Development LLC ("Lionshead") (together, "110 Church LLC

Defendants"). *See* Decl. of Leila Cardo in Supp. of 110 Church LLC's Mot. for Summ. J.

("Cardo Decl."), Exh. D.  On September 13, 2001, the property manager for Lionshead's parent

company, Neal Cohen, inspected the building.  Cohen discovered that the engine from Flight 175

had struck the 16th floor, tearing a 15 by 18 foot hole in the exterior of the building.  *See id.*, Exh.

F at 27-29.  In addition, dust and debris from the collapsing World Trade Center towers was

present throughout the building.  *See id.*, Exh. F at 29-32.  Cohen retained Environmental

Monitoring and Consulting Associates ("EMCA") to "test the debris and see if there is any

asbestos in it."[3]  *Id.* at 34.  The contract between Lionshead and EMCA called for the "complete

removal and disposal of all asbestos contaminated dust and the decontamination of all surfaces."

Cannata Decl., Exh. 95 at 5.  EMCA agreed to provide all union labor and equipment necessary

to complete the work.  *See id.*  The contract required the labor to consist of licensed asbestos-

abatement workers, *see id.* at 6, and notifications were posted advising the public of the ongoing

asbestos abatement project, *see* Cardo Decl., Exh. F at 48.

Lionshead retained Socha's employer, Pinnacle Environmental Corp.

("Pinnacle"), to conduct the asbestos abatement and debris removal.  *See* Cardo Decl., Exh. H.

That contract similarly required the use of "asbestos-certified personnel."  *See id.* at 1.  Socha

worked for Pinnacle at 110 Church Street for a total of 189 hours from December 3, 2001 to

December 10, 2001 and December 17, 2001 to December 24, 2001.  *See id.*, Exh. J.  His work

consisted primarily of removing dust, moldy sheetrock, and cleaning air ducts.  *See* Cannata

Decl., Exh. 53 at 236-39.  Other Pinnacle workers demolished sheetrock and walls and removed

a drop ceiling and floor tiles.  *See id.*, Exh. 35 at 31.  In addition, Socha would momentarily

---

[3] On two prior occasions, Cohen had also hired EMCA to "investigate for asbestos, develop a protocol for the
removal of asbestos, and to manage the asbestos subcontractors' removal."  Cardo Decl., Exh. F at 34.

place his head and upper body inside HVAC ducts in order to vacuum out dust. *See id.*, Exh. 53 at 239-41. Socha alleges that asbestos-abatement procedures were followed. *See id.*, Exh. 53 at 236. The 110 Church LLC Defendants did not directly supervise Pinnacle or EMCA. *See* Cardo Decl., Exh. F at 52, 59.

**B.    90 Church Street**

90 Church Street is located one block north of the World Trade Center site. On September 11, 2001, the building was owned by the United States Postal Service, which had leased it to 90 Church Street L.P. *See* Decl. of Richard Leff in Supp. of Boston Properties Mot. for Summ. J. ("Leff Decl."), Exh. I. Boston Properties, Inc. ("Boston Properties") managed the property. *See id.*, Exh. H at 11. The west side of 90 Church Street sustained severe structural damage—part of 7 World Trade Center had collapsed into its base and projectiles from the collapsing towers destroyed hundreds of windows. *See id.*, Exh. H at 58. Dust and debris were present throughout the building. *See* Cannata Decl., Exh. 47 at 155-56.

Boston Properties hired Ambient Group, Inc. ("Ambient") to evaluate the environmental condition of the building, develop a remediation protocol, and monitor the restoration process. *See* Leff Decl., Exh. J at 29-30. Boston Properties did not limit the scope of Ambient's work to asbestos abatement. *See* Cannata Decl., Exh. 175. Boston Properties retained Structure Tone, Inc. as general contractor for all repair and reconstruction of 90 Church Street. *See* Leff Decl., Exh. H at 103-05, 111. Together, Structure Tone, Ambient, Boston Properties, and several non-party tenants developed a safety and remediation protocol that required testing of multiple contaminants including cement dust, PCBs, dioxins, asbestos, heavy metals, and pH levels. *See* Leff Decl., Exh. K at 30-34; Cannata Decl., Exh. 177 at 10-12. The

6

protocol also required the use of licensed asbestos-abatement workers, compliance with asbestos regulations, and that workers be required to wear half-mask respirators. *See id.*, Exh. 177 at 6.

Structure Tone, as general contractor, oversaw the remediation process at 90 Church Street. It retained subcontractors and ensured compliance with safety protocols, including the use of proper respiratory equipment. *See* Aff. of William Joyce in Supp. of Structure Tone, Inc.'s Mot. for Summ. J. ("Joyce Aff."), Exh. F at 46-47. While Structure Tone provided its own employees with "powered air purifying respirators," *see id.*, Exh. G at 21-22, it did not provide any equipment directly to the subcontractors' workers, *see id.*, Exh. F at 52, 90. Rather, subcontractors provided their employees with respiratory equipment and told them how often to change their filters. *See id.*, Exh. G at 73, Exh. H at 54, 64, 78. If a subcontractors' worker was not wearing the proper respiratory equipment, a Structure Tone representative would speak with the subcontractor foreman. *See id.*, Exh. G at 26, 49, 50, Exh. H at 38, 44. Additionally, Structure Tone's subcontractors would propose the manner and method of the work to Ambient, who would approve or disapprove the proposal. *See id.*, Exh. F at 152.

Socha first worked at 90 Church Street for one day on or around November 5, 2001 for ETS Contracting ("ETS"), a subcontractor hired to perform the remediation. *See* Leff Decl., Exh. O at 333-36. His task was to build a decontamination unit in an area that had already been cleaned, *see id.*, and the workers did not wear respiratory masks during this work, *see id.* Socha worked again at 90 Church Street for three weeks in May and June of 2003 as an employee of Pinnacle. *See* Leff Decl., Exh. S at 256-59. The project was a "typical asbestos abatement," Socha wore a full-mask respirator, and was provided mask filters. *See id.*, Exh. S at 257, Exh. O at 342. While working for Pinnacle, Socha "demolished rooms," *see* Cannata Decl., Exh. 55 at 495-96, removed debris, and applied asbestos encapsulant to certain floors, *see id.*

7

Exh. 54 at 341; Leff Decl., Exh. S at 259. Other workers removed HVAC ducts and electrical

cables, *see* Cannata Decl., Exh. 64 at 127, Exh. 65 at 74-75, and boarded up broken windows,

*see* Joyce Aff., Exh. F at 36.

### C.    1 Liberty Plaza

1 Liberty Plaza is located one block east of the World Trade Center site. At the

time of the World Trade Center attacks it was owned by Brookfield Properties OLP Co. LLC and

managed by Brookfield Financial Properties, LP (together, "Brookfield OLP"). The collapsing

World Trade Center towers broke numerous windows and dust and debris up to two feet deep

infiltrated the building. *See* Cannata Decl., Exh. 19H. Pursuant to an oral agreement, Brookfield

OLP retained Hillmann Environmental Group, Inc. ("Hillmann") to test the dust and debris for

multiple toxins, prepare a "health and safety plan," and "coordinate environmental clean-up."

*See* Cannata Decl., Exh. 80; Decl. of Salvatore J. Calabrese in Supp. of Hillmann's Mot. for

Summ. J. ("Calabrese Decl."), Exh. C ¶ 48.

On September 16, 2001, Hillmann tested the asbestos content of the dust. *See*

Cannata Decl., Exh. 81. Although testing revealed the dust to contain less than 1% asbestos, *see*

*id.*, Exh. 81, "Brookfield [OLP] opted to use abatement methodologies and licensed asbestos

abatement workers," *see id.*, Exh. 80 at 2, Exh. 81; Calabrese Decl., Exh. G at 82. Accordingly,

Hillmann recommended subcontractors ETS and PAL Environmental Contracting ("PAL"), who

used "asbestos abatement methodologies" to perform the remediation. *See* Cannata Decl., Exh.

80 at 3. Hillmann did not test the pH levels of the airborne dust. *See id.*, Exh. 80 at Table 2.1.

Socha worked at 1 Liberty Plaza for ETS for approximately three weeks

beginning in late September 2001. *See id.*, Exh. 54 at 376. While there, he removed

contaminated ceiling tiles and sprayed floors with asbestos encapsulant. *See id.*, Exh. 53 at 222.

8

Other workers removed broken window frames, removed sheetrock, vacuumed and wiped up dust, and cleaned HVAC systems. *See id.*, Exh. 17B, Exh. 18D. During his work at 1 Liberty Plaza, an ETS supervisor instructed Socha to wear a half-mask respirator, which ETS provided. *See id.*, Exh. 53 at 222, Exh. 54 at 345, 377.

### D.     1 World Financial Center

1 World Financial Center is located directly southwest of the World Trade Center site. The building is owned by Brookfield Properties One WFC Co. LLC and managed by Brookfield Financial Properties LP (together, "Brookfield 1 WFC"). *See* Brookfield Properties One WFC Co. LLC Rule 56.1 Statement of Undisputed Facts ¶¶ 35-36. 1 World Financial Center sustained broken windows and fire damage; the dust and debris that inundated the building measured two feet high in the lobby and two to three inches on the lower floors. *See* Cannata Decl., Exh. 18A, Exh. 20A.

Brookfield 1 WFC hired Hillmann as its environmental consultant to develop clean-up and remediation procedures for the building. *See* Decl. of William J. Smith in Supp. of Brookfield Properties One WFC Co. LLC et al. Mot. for Summ. J. ("Smith Decl."), Exh. C at 53-54. As at 1 Liberty Plaza, Hillmann's initial testing for asbestos revealed less than 1% asbestos content. *See* Cannata Decl., Exh. 86 at 1. Hillmann noted in its Environmental Recovery Report that the debris was not considered "asbestos containing material by regulation," but that "Brookfield opted to clean all heavily dusty areas using asbestos abatement methodologies." *Id.*

Socha worked at 1 World Financial Center for ETS for approximately four weeks beginning September 21, 2001. *See* Cannata Decl., Exh. 54 at 370-73. While there, he cleaned and removed debris from the lobby, offices and the roof. *See id.*, Exh. 53 at 217-18. Other

workers removed ceiling tiles and sheetrock. *See id.*, Exh. 18A, Exh. 20A, Exh. 59 at 525.

Socha wore a half-mask respirator and was forced to reuse filters. *See id.*, Exh. 53 at 217-18.

### E.    2 World Financial Center

2 World Financial Center is located directly west of the World Trade Center site.

On September 11, 2001, the building was owned by WFP Tower B Co. L.P., a Brookfield entity,

and leased to Merrill Lynch & Co., Inc. ("Merrill Lynch"). *See* Aff. of David M. Kindbergh in

Supp. of Merrill Lynch Mot. for Summ. J. ("Kindbergh Aff.") ¶¶ 2-3.  BPCA was the ground

lessor. *See* Goldstein Decl., Exh. SS at 16.  2 World Financial Center sustained substantial

damage to its eastern façade and a significant amount of dust and debris entered the building.

*See id.*, Exh. DD.  The "Winter Garden," a glass-enclosed lobby connecting 2 World Financial

Center and 3 World Financial Center, suffered severe structural damage including broken

windows and demolished walls. *See* Cannata Decl., Exh. 139.

Merrill Lynch retained Weston Solutions, Inc. ("Weston") to develop an "indoor

air quality program" for 2 World Financial Center. *See* Goldstein Decl., Exh. O ¶ 5.  Beginning

September 26, 2001, Weston conducted comprehensive testing for numerous "potential air

contaminants," including asbestos, fibrous glass, heavy metals, and volatile organic compounds.

*See id.*, Exh. GG, Exh. W.  After Weston's air testing revealed the presence of asbestos, Merrill

Lynch was allegedly "advised by Weston that [it] should treat the cleanup as an asbestos

abatement." *See id.*, Exh. KK at 104-105.  Weston, in contrast, denies that it advised Merrill

Lynch with respect to the abestos abatement. *See* Defendant Weston Solution, Inc.'s Rule 56.1

Statement of Undisputed Facts ¶ 5.  There is no evidence that Weston tested the pH level of the

dust. *See* Cannata Decl., Exh. 123.  While Weston denies directly supervising the abatement

workers or developing a safety protocol for the general abatement work at 2 World Financial

Center, it did create a remediation protocol and provided project monitoring for mold abatement conducted in the basement. *See* Goldstein Decl., Exh. O ¶¶ 6-8.

Certain tenants at 2 World Financial Center retained Hillmann as their environmental consultant. *See* Aff. of Christopher Hillmann in Supp. of Hillmann Mot. for Summ. J. ("Hillmann Aff."), Exh. D. Hillmann did not have any agreement with Merrill Lynch nor did it perform any work for Merrill Lynch. However, Hillmann did conduct environmental monitoring during and after the cleanup and conducted an asbestos survey for Brookfield in the retail space. *See* Hillmann Aff., Exh. C ¶¶ 3-8, 20-46.

Merrill Lynch retained Pinnacle and Blackmon-Mooring Steamatic Catastrophe, Inc. ("BMS") to conduct the dust remediation and bulk cleanup. *See id.*, Exh. Y at 1. Pinnacle also conducted the mold abatement in the basement levels. *See id.*, Exh. O ¶ 8. Because initial environmental testing revealed asbestos levels over 1%, Pinnacle implemented asbestos abatement procedures during the cleanup. *See id* at 2. BMS alleges that it only performed "fine cleaning" at 2 World Financial Center. *See* BMS Mem. of Law in Supp. of Mot. for Summ. J. at 6. However, it acknowledges that it supervised part of the Pinnacle work force, including Socha, for a total of 19 days between November 25, 2001 and March 11, 2002. *See id.*

On October 19, 2001, Indoor Environmental Technologies, Inc. ("IET") conducted a single post-cleanup testing of the HVAC system for asbestos, lead, and microbial contamination. *See* Aff. of John Stanley in Supp. of IET Mot. for Summ. J. ("Stanley Affidavit") ¶ 4, Exh. A. Beginning in February 2002, IET provided limited consulting services and project management for environmental testing of the HVAC system at 2 World Financial Center. *See id.*, Exh. B, Exh. D. IET presents evidence that it neither developed safety protocols for the abatement work performed by Pinnacle nor directly supervised Socha's work. *See id.* ¶¶ 14-15.

11

Socha worked at 2 World Financial Center for approximately 10 weeks between November 2001 and April 2002 as a Pinnacle employee. *See* Goldstein Decl., Exh. B. His work consisted of dust abatement, cleaning HVAC systems, and removing moldy sheetrock and wall studs from the basement. *See* Cannata Decl., Exh. 53 at 227, 239, Exh. 54 at 352-53. Other workers removed contaminated ceiling tiles and constructed a wooden tunnel through which debris was removed. *See id.*, Exh. 59 at 557, Exh. 66 at 302-03. When supervised by BMS, Socha alleges that even standard asbestos-abatement procedures were not followed. In particular, replacement filters were unavailable, the site lacked a decontamination unit, and BMS supervisors told him that no respirator was necessary. *See id.*, Exh. 53 at 170; Exh. 54 at 328-29.

**F.     4 World Financial Center**

4 World Financial Center is located one block west of the World Trade Center site at 250 Vesey Street. On September 11, 2001, the building was owned by WFP Tower D Co. L.P., a Brookfield entity, and leased to Merrill Lynch. *See* Kindbergh Aff. ¶¶ 2-3. BPCA was the ground lessor. *See* Goldstein Decl., Exh. SS at 16. 4 World Financial Center suffered no structural damage but significant amounts of dust and debris infiltrated the building. *See* Goldstein Decl., Exh. LL at 102-03; Cannata Decl., Exh. 41 at 62. In mid-September, Merrill Lynch hired Weston to "provide oversight to all asbestos handlers in the building" and have air samples "analyzed for [asbestos containing material]" between September 15, 2001 and September 21, 2001. *See id.*, Exh. 154 at 2; Goldstein Decl., Exh. F, Exh. O ¶ 9; Exh. K at 1. In October 2001, after the asbestos abatement work was complete, Weston began testing for other elements, such as volatile organic compounds, PCBs, fibrous glass, heavy metals, and dioxons. *See* Cannata Decl., Exh. 152 at 26:9-27:8; Goldstein Decl., Exh. P, Exh. W, Exh. Z.

While Weston claims that it did not develop a safety protocol for work at 4 World Financial Center, *see* Kauffman Decl., Exh. O ¶ 9, a report it prepared in October 2001 notes that all asbestos abatement workers were required to wear half-mask respirators and that Weston monitored subcontractor compliance with safety protocols and regularly tested the air for asbestos. *See id.* at 2-7. Although the record reflects a significant focus on asbestos abatement, *see, e.g.*, Goldstein Decl., Exh. F; Cannata Decl., Exh. 157, Exh. 158, it is unclear whether Merrill Lynch, Weston or GPS made the decision to treat the initial remediation as an asbestos abatement, *see, e.g.*, Cannata Decl., Exh. 152 at 16:18-24 (deposition of Bruce Ehrich testifying that the decision regarding what should be tested for was based upon "discussions" between Weston and Merrill Lynch). Weston presents evidence that it did not directly supervise the abatement workers. *See* Kauffman Decl., Exh. O ¶ 9.

Merrill Lynch retained Pinnacle to perform the remediation work beginning in September 2001. *See* Goldstein Decl., Exh. K. Socha worked for Pinnacle at 4 World Financial Center for approximately 10 weeks between November 2001 and April 2002. *See* Goldstein Decl, Exh. B. While there, he performed general cleaning activities, which included vacuuming inside HVAC ducts. *See id.*, Exh. II at 261:2-5, 228:11-20. Other workers removed floor and ceiling tiles and demolished sheetrock. *See* Cannata Decl., Exh. 49 at 132; Exh. 34 at 44, 156. Workers wore half-face respirators but a decontamination unit was allegedly not available. *See* Exh. 49 at 134. Further, some workers were allegedly instructed not to wear their respirators outside the building and received no instructions for the use of personal protective equipment. *See* Exh. 34 at 88. Neither Socha nor the Defendants point to any facts that indicate what type of respiratory equipment Socha wore while working at 4 World Financial Center.

**G.     222 Broadway**

13

222 Broadway is located one block east of the World Trade Center site. On September 11, 2001 it was owned by 222 Broadway, LLC, a Merrill Lynch entity. *See* Goldstein Decl., Exh. MM at 183:7-12. While 222 Broadway suffered no structural damage, significant amounts of dust and debris infiltrated the building. *See* Cannata Decl., Exh. 23B, Exh. 19G; Goldstein Decl., Exh. R; Exh. MM at 187:19-188:2. Merrill Lynch retained GPS to provide "asbestos consulting services." *See* Goldstein Decl., Exh. R. Testing performed by GPS revealed small amounts of asbestos throughout the building. *Id.* For this reason, "an abatement contractor was selected to clean the building using asbestos specific procedures." *Id.*

Between September 14, 2001 and September 17, 2001, Pinnacle performed the asbestos abatement at 222 Broadway. *See id.* GPS provided project oversight and air monitoring during and after the abatement work. *See id.* In addition, Weston assisted GPS and developed a Health and Safety Plan, which called for the use of asbestos-specific safety procedures. *See* Cannata Decl., Exh. 134; Goldstein Decl., Exh. N at 15. Beginning on September 26, 2001, Weston also provided an indoor air quality program, which included monitoring for numerous substances, inlcuding asbestos and heavy metals. *See id.*, Exh. P. Because the samples yielded results below permissible OSHA levels, Merrill Lynch employees reoccupied the building in October 2001. *See* Goldstein Decl., Exh. O, Exh. P, Exh. Z.

On May 3, 2002, the NYC DEP informed Merrill Lynch that it had detected debris from the collapse of the World Trade Center towers on the exterior of the building. *See* Goldstein Decl., Exh. X. The NYC DEP instructed Merrill Lynch to perform further asbestos abatement on the exterior of the building. *See id.* The NYC DEP agreed to pay the fees charged by the abatement contractor and the independent environmental consultant. *See id.* Safety oversight was provided by the Occupational Health and Safety Administration ("OSHA"). *See*

14

*id.* Independent testing revealed that the debris on 19 outdoor setbacks at 222 Broadway contained no asbestos. *See* Goldstein Decl., Exh. BB. Nonetheless, Merrill Lynch retained Pinnacle to perform asbestos abatement. *See* Goldstein Decl., Exh. AA. Both GPS and Weston provided project oversight. *See id*, Exh. BB; Exh. FF. While the record reflects a significant focus on asbestos both during the initial abatement in September 2001 and the exterior cleaning in May 2002, it is unclear whether Merrill Lynch or it environmental consultants decided to treat the work as an asbestos abatement. Nothing in the record indicates whether GPS or Weston tested the alkalinity or pH level of the dust.

Socha worked for Pinnacle at 222 broadway during the week of May 20, 2002. *See* Goldstein Decl., Exh. B. While there, he vacuumed dust off the roof and cleaned balconies. *See* Cannata Decl., Exh. 53 at 248; Goldstein Decl., Exh. C at 267. Other workers constructed a wooden shed to clean the HVAC system, *see* Cannata Decl., Exh. 19, removed contaminated ceiling tiles, *see id.*, Exh. 23B, and removed the HVAC system, *see id.*, Exh. 34 at 6. According to a report prepared by GPS, a decontamination unit had been installed. *See* Goldstein Decl., Exh. R at 1. Socha, however, testified that a decontamination unit was not available. *See id.*, Exh. II at 248. Socha wore a half-face respirator and protective clothing during the exterior cleaning. *See* Goldstein Decl., Exh. II at 247:19-249:4.

## H.    61 Broadway

61 Broadway is located 2 blocks east and approximately 4 blocks south of the World Trade Center site. On September 11, 2001, the property was owned by Crown Broadway, LLC ("Crown Broadway") and managed by Crown Properties, Inc. *See* Decl. of Suzanne Harlbardier in Supp. of Crown Broadway, LLC Mot. for Summ. J. ("Harlbardier Decl."), Exh. F at 8:13-17, 13:3-11, 14:23-25. 61 Broadway did not sustain structural damage but a significant

15

amount of dust entered the building. *See id.*, Exh. D at 6; Cannata Decl., Exh. 54 at 51, 79, 326. Neither party points to any facts in the record that indicate the scope of the environmental testing performed in the building.

Socha worked for Pinnacle at 61 Broadway beginning in May 2002. *See* Harlbardier Decl., Exh. G. Neither party points to any facts that indicate the scope of the work performed by Pinnacle. Socha's work consisted of cleaning dust in offices and HVAC ducts. *See id.*, Exh. G at 246:5-6. During this work, he alleges that he wore a half-mask respirator and that a decontamination unit was unavailable. *See id.*; Cannata Decl., Exh. 53 at 247. When he cleaned HVAC ducts, Socha was required to remove his respirator to fit his head inside the duct. *See* Cannata Decl., Exh. 54 at 326.

## I.     70 Pine Street

70 Pine Street is located approximately seven blocks east and one block south of the World Trade Center site. On September 11, 2001, the building was owned by American International Realty Corporation and American International Realty Group (together, "AIRC"). *See* Decl. of Michael A. Savino in Supp. of AIRC Mot. for Summ. J., Exh. H at 19:11-15.  70 Pine Street sustained no structural damage, but dust from the collapsing World Trade Center towers infiltrated the building. *See* Cannata Decl., Exh. 53 at 206-07, Exh. 54 at 290.  AIRC hired North Atlantic Laboratories, Inc. ("NAL") to test the dust and debris for asbestos. *See id.*, Exh. 172.  NAL did not test the pH or alkalinity of the dust. *See id.*  The testing revealed that the debris was not "asbestos-containing material" as defined by state and federal regulation. *See id.* On September 19, 2001 AIRC hired Trade-Winds Environmental Restoration, Inc. ("Trade-Winds") to perform the clean-up work. *See* Savino Decl., Exh. H at 49:8-12, Exh. E.  Trade-Winds agreed to "[s]upply labor and equipment to perform clean-up of dust and debris." *Id.*  The

16

parties acknowledged in the agreement that "this dust and debris may be contaminated with asbestos." *Id.*

Socha worked as a Trade-Winds employee beginning on September 17, 2001. *See* Savino Decl., Exh. F. Trade-Winds utilized asbestos-specific procedures. *See id.*, Exh. G at 158:3-7. However, there is nothing in the record that indicates whether Trade-Winds or AIRC made the decision to employ such procedures. Jeffrey Micheli, a representative of Trade-Winds, testified that Trade-Winds exercised exclusive supervision over the employees and that employees were provided with half-mask respirators, body suits, gloves, boots and appropriate P100 filters. *See* Savino Decl., Exh. I at 127:17-24, 130:3-9, Exh. G at 311:12-15. He did not recall if there was a decontamination unit present. *See id.* at 130:13-15. As a Trade-Winds employee at 70 Pine Street, Socha wiped and vacuumed dust off office equipment and machinery inside offices, a "machine room," and the basement. *See id.* at 309:21-310:1, 292:13-17, 300:1-7. In addition, he worked in the basement and small "pump" rooms. *See* Cannata Decl., Exh. 53 at 207. Socha acknowledges that during this work he wore a half-mask respirator, gloves, hard hat, and full suit. *See id.* at 311:12-15, 295:11-14, 301:1-6.

### J.     100 Church Street

100 Church Street is located approximately one block north of the World Trade Center site. Dust from the collapsing World Trade Center towers infiltrated the building. *See* Cannata Decl., Exh. 26 at 25, Exh. 29 at 70. Merrill Lynch, an occupant of several floors, retained IET to conduct a limited inspection of the ventilation system on November 8, 2001. *See* Stanley Aff., Exh. E. From February 2002 to June 2002, IET provided post-cleaning air monitoring for Merrill Lynch. *See id.* ¶¶ 16-19. IET presents evidence that it neither developed

17

a safety protocol for the clean-up work conducted at 100 Church Street nor exercised supervision over any clean-up workers. *See id.* ¶¶ 11-20. Socha points to no evidence to the contrary.

## II.     Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the court must view all evidence in the light most favorable to the nonmoving party, *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sec. Ins. Co. of Hartford*, 391 F.3d at 83. However, in deciding a motion for summary judgment, a District Court is not required to "scour the record on its own in a search for evidence" where the non-moving party fails to adequately present it. *CILP Assocs. LP v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013) (internal quotations and citations omitted).

## III.    Discussion

### A.     Exceptions to the Duty to Provide a Safe Workplace

Defendants first argue that Socha's claims are barred by two related exceptions to the duty to provide a reasonably safe workplace. In general, there is no duty to protect workers from defective conditions that are "part of or inherent in" the very work being performed or those that are "readily observed by reasonable use of the senses in light of the worker's age, intelligence and experience." *Bombero v. NAB Constr. Corp.*, 10 A.D.3d 170, 171-72 (1st Dep't

18

2004) (holding no duty owed to employee who walked directly on exposed steel bars that were part of the construction) (citing *Gasper v. Ford Motor Corp.*, 13 N.Y.2d 104 (1963)); *see also O'Sullivan v. IDI Constr. Co., Inc.*, 7 N.Y.3d 805, 806 (2006) (holding landowner had no liability under section 241(6) where "the electrical pipe or conduit that plaintiff tripped over was an integral part of the construction"). By contrast, the exception will not apply if an injured worker had no reason to be aware of the specific danger allegedly inherent to the work. *See Brady v. Pa. Steel Co.*, 215 N.Y. 456 (1915) (holding "inherent danger" exception inapplicable where worker was killed from fall after stepping on bridge's railroad tie that other workers had sawed in half, as part of their work, because decedent had no reason to know other workers had done so). Further, the "open and obvious" nature of a defective condition does not negate the duty to maintain premises in a reasonably safe manner but, rather, only raises an issue of fact as to a plaintiff's comparative fault. *See Francis v. 107-145 West 135th Street Assocs.*, 70 A.D.3d 599, 600 (1st Dep't 2010).

A related exception applies where the particular defect giving rise to a plaintiff's injury was the very defect the injured plaintiff was hired to remediate. *See Kowalsky v. Conreco Co.*, 264 N.Y. 125, 128 (1936) ("An employee cannot recover for injuries received while doing an act to eliminate the cause of the injury."); *Hanson v. Trs. of Methodist Episcopal Church of Glen Cove*, 51 A.D.3d 725 (2d Dep't 2008) (rejecting premises liability claim where worker was injured by rotted roof he was hired to repair). However, if an employee is injured by some defective condition he was not *specifically* hired to remediate, the exception will not apply. *See, e.g., Colello v. T.J. Stevenson & Co., Inc.*, 284 A.D. 805, 806-07 (2d Dep't 1954) (holding exception inapplicable where employee was overcome by noxious gasses because the employee's company was hired to clean oil tanks for grain storage and not to specifically

19

remediate noxious gasses in the tanks); *see also Patalano v. Am. President Lines, Inc.*, 322 F.

Supp. 2d 293, 295-97 (E.D.N.Y. 2004) (holding exception inapplicable where question of fact

existed as to whether longshoremen injured by damaged container door were in the specific act

of repairing the defective door when injured).

            Defendants argue that both exceptions apply because Socha was hired to

remediate the dust and, as a licensed asbestos worker, he should have known that the risk of

respiratory injury is inherent to such work. *See, e.g.*, Mem. of Law in Supp. of Boston

Properties, Inc. Mot. for Summ. J. at 11-12. However, in the cases cited by Defendants, there

was no evidence that the injured worker was unaware of the *specific* risk giving rise to the injury.

*See, e.g.*, *Wilhouski v. Canon U.S.A.*, 212 A.D.2d 525 (2d Dep't 1995) (dismissing section 200

premises liability claim because danger was "open and obvious"); *Abbadessa v. Ulrik Holding

Ltd.*, 244 A.D.2d 517 (2d Dep't 1997) (dismissing premises liability claim because sanitation

worker was injured after attempting to lift refrigerator unassisted); *Waiters v. N. Trust Co. of

N.Y.*, 29 A.D.3d 325 (1st Dep't 2006) (applying exception where plaintiff slipped on wet marble

floors he was hired to mop); *Skinner v. G&T Realty Corp. of N.Y.*, 232 A.D.2d 627 (2d Dep't

1996) (applying exception where plaintiff was injured by defective window he was hired to

replace). Here, by contrast, there is evidence that Socha was hired to remediate asbestos and

perform general debris removal, but that he had no reason to know of the *specific* risks posed by

the "alkaline-based" dust. *See, e.g.*, Cannata Decl., Exh. 8 at 9-10, Exh. 80 at 2-3, Exh. 86 at 1,

Exh. 177 at 6; Cardo Decl., Exh. H, Exh. J; Goldstein Decl., Exh. R. For example, at 110-120

Church Street, Lionshead retained Pinnacle to conduct asbestos abatement and debris removal.

*See* Cardo Decl., Exh. H. However, Defendants point to no evidence that Socha was aware of

the particular hazard posed by "high-alkaline" dust. Accordingly, Defendants have failed to

carry their burden of showing that, as a matter of law, the hazard posed by the "alkaline-based" dust was inherent to the *specific* work Socha was hired to perform. *See Brady*, 215 N.Y. at 459-60; *Colello*, 284 A.D. at 806-07; *Patalano*, 322 F. Supp. 2d at 295-97 & n.1. Thus, there are questions of fact relating to the exceptions.

**B.     Scope of the Duty Imposed by the New York Labor Law**

The New York Court of Appeals has defined the scope of the duty to provide a safe workplace imposed by sections 200 and 241(6) of the New York Labor Law. In *Russin v. Louis N. Picciano & Son*, the Court held that in order for a party to be liable under section 200, it must "have the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition." 54 N.Y.2d 311, 317 (1981). Likewise, while section 241(6) only applies to "contractors, owners and their agents," *see* N.Y. Labor Law § 241(6) (McKinney 2014), a party will be considered a statutory "agent" if it has the authority to control the "injury producing activity." *Id.* at 317-18.

The Environmental Consultant Defendants argue that to be considered a statutory "agent" under the Labor Law, one must have the authority to supervise or control a plaintiff's day-to-day work. *See Walls v. Turner*, 4 N.Y.3d 861 (2005) ("[W]e have limited the definition of the term 'agents' to those who have authority to supervise and control [the] work from which an injury arises.") (internal quotations and citations omitted). The Environmental Consultant Defendants point to facts suggesting that they lacked such authority. For example, Weston's project manager, Bruce Ehrich, testified that Weston did not supervise Socha's work at 2 World Financial Center or 4 World Financial Center, or direct the manner in which that work was performed. *See* Kauffman Decl., Exh. O, ¶ 10. Nor did Weston have the authority to hire or terminate the clean-up workers. *See id.* ¶ 10. Accordingly, the Environmental Consultant

21

Defendants argue that they were not statutory "agents" and, therefore, owed no duty to Socha under the New York Labor Law. *See, e.g.*, Weston Mem. of Law in Supp. of Mot. for Summ. J. at 6-7.

However, the cases cited by the Environmental Consultant Defendants turn upon a party's authority to control the daily work of a plaintiff because those injuries arose from the plaintiff's daily work. *See, e.g.*, *Wall*, 4 N.Y.3d at 863 (finding defendant to be an agent because it had the authority to control the construction of scaffolding from which plaintiff fell); *Pino v. Irvington Union Free Sch. Dist.*, 43 A.D.3d 1130, 1131 (2d Dep't 2007) (finding defendant to be an agent after plaintiff fell from scaffolding because it had the authority to stop work upon discovery of unsafe conditions). But a duty arises not only when a defendant had the authority to actively control a plaintiff's work on a daily basis but, rather, when a defendant had the authority to "correct or prevent [the] unsafe condition" giving rise to a plaintiff's injuries. *See Russin*, 47 N.Y.2d at 317; *Chowdhury v. Rodriguez*, 57 A.D.3d 121, 129-130 (2d Dep't 2008) ("[W]e are reminded that a basic, underlying ground for the imposition of any liability under both Labor Law § 200 and the common law is the authority of the defendant to remedy the dangerous or defective condition at issue."). The statutory "agents" in the cases cited by the Environmental Consultant Defendants fell within the scope of the Labor Law because they had the ability to prevent or correct the unsafe condition, not merely because they had the authority to maintain a daily supervisory presence at the worksites.

Here, the alleged unsafe condition giving rise to Socha's injuries was the choice to use respiratory equipment appropriate for asbestos abatement, but not designed to protect workers from the "high-alkaline," large particulate dust present in the buildings. In support of this allegation, Socha presents evidence that the Environmental Consultant Defendants had the

22

authority "to avoid or correct [this] unsafe condition" by properly testing the "high-alkaline" dust and warning the owners and contractors about the need for appropriate respiratory equipment. For example, Socha points to the engagement letter between Brookfield Financial Properties, LP and Hillmann for environmental consulting at One Liberty Plaza. That document states that "Hillmann was hired to prepare health and safety plans, test for environmental issues, and coordinate environmental clean-up responses in the building." Cannata Decl., Exh. 80 at 3. Indeed, Hillmann acknowledges that "it provided test results to its clients," "explained their significance," and "recommended qualified contractors to do the work." Mem. of Law in Supp. of Hillmann Mot. for Summ. J. ("Hillmann Br.") at 2-3. Similarly, Boston Properties hired Ambient to help "develop a remediation protocol to reoccupy" 90 Church Street. Leff Decl., Exh. J at 29-30, 49. Indeed, there is evidence that Ambient would approve equipment and procedures proposed by Structure Tone. *See* Joyce Aff., Exh. F at 152. Likewise, a report by Weston for its work at 4 World Financial Center provided for the safety equipment workers were required to wear and noted that Weston monitored compliance with the safety protocol. *See* Kauffman Decl., Exh. O ¶ 9. Accordingly, Socha has raised a triable issue of fact as to whether Hillmann, Ambient, and Weston had the authority to "avoid or correct" the use of inadequate respiratory equipment,[4] *Russin*, 54 N.Y.2d at 317, and therefore owed a duty to Socha under the Labor Law.

Similarly, Socha has raised an issue of fact with respect to the role played by Structure Tone, at 90 Church Street, and BMS, at 2 World Financial Center, in the decision to

---

[4] The Environmental Consultant Defendants' argument that they could not have had the authority to supervise Socha's day-to-day work because they were not licensed to perform asbestos abatement is similarly unavailing. *See, e.g.*, Hillmann Br. at 18-20 (citing N.Y. Comp. Codes R. & Regs., tit. 12, § 56)). As noted, it is not a party's authority to control a plaintiff's work that is necessarily relevant, but its ability to correct the injury producing activity. *See Russin*, 47 N.Y. at 317; *Chowdhury*, 57 A.D.3d at 129-130. Socha alleges that the Environmental Consultant Defendants' development of remediation protocols focusing primarily, and sometimes exclusively, on asbestos abatement was unreasonable, not simply that their *supervision* of the asbestos abatement was unreasonable.

23

provide workers with asbestos-specific equipment. At 90 Church Street, there is evidence that Structure Tone helped develop the safety and remediation protocol, which recommended the type of safety equipment to be used by workers. *See* Leff Decl., Exh. K at 30-34; Cannata Decl., Ex. 177 at 10-12. Similarly, there is evidence that during the time BMS supervised Socha, replacement filters were unavailable and Socha was told that no respirators were necessary. *See id.*, Exh. 53 at 170, Exh. 54 at 329. Accordingly, there is an issue of fact as to whether Structure Tone or BMS had the authority to "avoid or correct" the use of inadequate respiratory equipment, *Russin*, 54 N.Y.2d at 317, and therefore owe a duty to Socha under the New York Labor Law.

Socha has not, however, raised a triable issue of fact with respect to IET's duty. IET has presented evidence that the scope of its work performed at 100 Church Street and 2 World Financial Center was limited to one-time inspections of the HVAC systems and post-cleanup air monitoring. *See* Stanley Aff. ¶¶ 4, 16-19, Exh. A-B. Further, IET has presented evidence that it neither developed safety and remediation protocols nor supervised Socha's work. *See id.* ¶¶ 11-20. Socha has failed to point to any contradictory evidence. Accordingly, I hold that IET owed no duty to Socha and grant its motion for summary judgment in its entirety.

## C.     Duty of Contracting Parties to Non-Contracting Third Parties

Hillmann additionally argues that its duty at One Liberty Plaza and 2 World Financial Center was limited to the contract it executed with the owners of those buildings. *See* Hillmann Br. at 36. It is true that "[a] contractual obligation, standing alone, will generally not give rise to tort liability in favor of a third party." *Espinal v. Melville Snow Contractors*, 98 N.Y.2d 136, 138 (2002). To allow otherwise, would render contracting parties liable "to an indefinite number of potential beneficiaries." *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y.

24

160 (1928) (Cardozo, J.) (holding that water company owed no duty to property owner who suffered property damage from fire as a result of the company's failure to adequately perform its contract with the city to provide water to hydrants). Thus, in general, a contracting party will not be liable to a non-contracting third party for claims arising from the negligent performance, or non-performance, of the contract. *See Espinal*, 98 N.Y.2d at 140.

However, a contracting party "may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations." *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (1995). For example, a defendant may owe a duty to those with whom it is not in privity if "the contracting party, in failing to exercise reasonable care in the performance of [its] duties, launche[s] a force or instrument of harm." *Espinal*, 98 N.Y.2d at 140; *see also MacPherson v. Buick*, 217 N.Y. 382 (1916) (Cardozo, J.). Likewise, if, in the course of discharging its contractual obligations, a party "creates an unreasonable risk of harm to others, or increases that risk," the party may be liable to those foreseeably injured by its conduct. *See Sciscente v. Lill Overhead Doors, Inc.*, 78 A.D.3d 1300, 1301 (3d Dep't 2010); *see also Jenkins v. Related Cos., L.P.*, 114 A.D.3d 435 (1st Dep't 2014) (finding question of fact as to whether a party hired to perform snow removal exacerbated the hazardous condition by failing to adequately salt a path).

Initially, I note that *H.R. Moch Co.* and its progeny stand for the general public policy that courts will not impose a tort duty on a contracting party where doing so would expose the party to potentially unlimited and undefined liability. *See* 247 N.Y. at 165 (Cardozo, J.) ("An intention to assume an obligation of indefinite extension to every member of the public is seen to be the more improbable when we recall the crushing burden that the obligation would impose.").

25

Here, the scope of Hillmann's duty is already defined by section 200 of the New York Labor Law, which limits the duty of owners, general contractors, and their agents, to provide a safe environment, not to the public at large, but to the workers employed at a worksite. *See In re Joint E. & S. Dist. Asbestos Litig.*, 827 F. Supp. 1014, 1052–53 (S.D.N.Y.1993); *Russin*, 47 N.Y.2d at 316-18. Thus, there is no risk of the boundless tort liability Judge Cardozo sought to limit in *H.R. Moch Co*.

Even assuming the *H.R. Moch Co.* line of authority applies, there are factual issues as to whether certain of the Environmental Consultant Defendants breached an independent duty of care owed to Socha by "launch[ing] a force or instrument of harm." *Espinal*, 98 N.Y.2d at 140; *see also Coughtry v. Globe Woolen Co.*, 56 N.Y. 124, 128 (1874) (holding that duty to provide safe scaffolding for workers at construction site was "independent of the obligation created by a contract" to erect the scaffolding). Here, as noted above, there is evidence that the Environmental Consultant Defendants, at a minimum, influenced the decision to use allegedly inadequate respiratory equipment. *See, e.g.*, Leff Decl., Exh. J at 29-30; Smith Decl., Exh. C at 53-54; Goldstein Decl., Exh. KK at 104-05, Exh. O ¶ 8; Kauffman Decl., Exh. O ¶ 9; Cannata Decl., Exh. 80, Exh. 81, Exh. 86, Exh. 134, Exh. 152 at 16:18-24, Exh. 157, Exh. 158. Thus, Socha has presented evidence that Ambient, Hillmann, and Weston exacerbated the existing hazard by influencing the choice of respiratory equipment incapable of handling that particular hazard. Accordingly, the Environmental Consultant Defendants owed Socha a duty of care with regard to their evaluation of the working environment and the adequacy of respiratory equipment protecting the workers working in that environment.

**D.    New York Labor Law Section 200**

26

Defendants argue that Socha has failed to raise a triable issue of fact sufficient to support a claim under section 200 of the New York Labor Law. Section 200 codifies[5] the common law duty "to protect the health and safety of employees." *In re Joint E. & S. Dist. Asbestos Litig.*, 827 F. Supp. 1014, 1052–53 (S.D.N.Y.1993), *aff'd in part rev'd in part on other grounds*, 52 F.3d 1124 (2d Cir. 1995). Specifically, section 200 requires that a workplace "be so constructed, equipped, arranged, operated and conducted as to provide a reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places." N.Y. Labor Law § 200(1) (McKinney 2014). The law applies to all workplaces and does not require a worker to be engaged in "construction, excavation, or demolition." *Mejia v. Levenbaum*, 30 A.D.3d 262, 263 (1st Dep't 2006).

Section 200 has two disjunctive standards for determining liability. *See Chowdury v. Rodriguez*, 57 A.D.3d 121, 128 (2d Dep't 2008). When a plaintiff's injury "arises out of defects or dangers in the methods or materials of the work," the "means and methods" standard will apply. *Id.* By contrast, where a plaintiff's injuries arise out of the "condition of the premises rather than the methods or manner of the work," the "premises liability" standard applies. *Id.* If an injury arises from both sets of conditions, concurrently, the proofs are to be evaluated under both standards. *See Reyes v. Arco Wentworth Mgmt. Corp.*, 83 A.D.3d 47, 52 (2d Dep't 2011) ("When an accident is alleged to involve defects in both the premises and the equipment used at the work site, the property owner moving for summary judgment with respect to causes of action alleging a violation of Labor Law § 200 is obligated to address the proof applicable to both liability standards.").

---

[5] Because section 200 is a codification of common law negligence, courts analyze the claims simultaneously. *See Wojcik v. 42nd St. Dev. Project*, 386 F. Supp. 2d 442, 455, n. 15 (S.D.N.Y. 2005) (collecting cases).

Socha alleges that his injuries arose from two concurrent causes: (1) the toxic "alkaline-based" dust and debris that spewed out of the collapsed World Trade Center buildings on September 11, 2001, and (2) the use of respiratory equipment and safety procedures inappropriate for the particular hazard posed by the "alkaline-based" dust. Accordingly, I have to evaluate the proofs relevant to both the "means and method" standard and the "premises liability" standard. *See id.*, 83 A.D.3d at 52.

### 1. The "Means and Method" Standard

Where a plaintiff's claim arises out of an alleged defect or condition in the "methods or materials" of the work, a party subject to Labor Law § 200 cannot be held liable unless "it is shown that the party to be charged exercised some supervisory control over the operation." *Ross v. Curtis-Palmer Hydro-Elec. Co.*, 81 N.Y.2d 494, 505 (1993); *see also Persichilli v. Triborough Bridge & Tunnel Auth.*, 16 N.Y.2d 136 (1965) (holding that owner and general contractor were not liable for a subcontractor's failure to test air and properly ventilate underground water reservoir after subcontractor's employee asphyxiated on noxious gasses). This rule is rooted in the common law principle that parties should not be held liable for the acts of others over whom the party had no control. *See id.* Some New York courts have held that liability under the "means and methods" standard additionally requires actual or constructive notice of the harm. *See, e.g., Buckley v. Columbia Grammar & Preparatory*, 44 A.D.3d 263, 272 (1st Dep't 2007) ("§ 200 applies only to owners and contractors who actually exercise control or supervision over the work and had actual or constructive notice of the unsafe condition.").

Unlike the question of whether a party has a duty under the New York Labor Law—which only requires the *authority* to control the condition giving rise to the injury—

28

liability for a defect in the "means or method" of the work requires the *actual exercise* of control

over the method or manner of work giving rise to a plaintiff's injury. *Ross*, 81 N.Y.2d at 505.

The mere presence of a defendant at a worksite, general instructions regarding what work needs

to be done, and daily monitoring for safety violations are all insufficient to satisfy this

requirement. *See Natale v. City of New York*, 33 A.D.3d 772, 773 (2d Dep't 2006) ("General

supervisory authority at a work site for the purpose of overseeing the progress of the work and

inspecting the work product is insufficient to impose liability for common-law negligence and

under Labor Law § 200."); *see also Foley v. Consol. Edison Co. of N.Y.*, 84 A.D.3d 476, 477 (1st

Dep't 2011). Notice alone of an unsafe working condition, without an actual exercise of

supervisory control, is insufficient to impose liability. *See Ortega v. Puccia*, 57 A.D.3d 54, 61

(2d Dep't 2008) ("[W]hen the manner of work is at issue, no liability will attach to the owner

solely because [he or she] may have had notice of the allegedly unsafe manner in which work

was performed.") (internal quotations omitted).

      The Owner Defendants adequately show that they have not exercised supervisory

control over the work giving rise to Socha's injuries. *See, e.g.*, Cardo Decl., Exh. F at 52, 59.

Socha's opposition papers fail utterly to rebut the Owner Defendants' showing. Accordingly, I

hold that no genuine issue of material fact under the Section 200 "means and methods" standard

exists. Defendant Owners' motions for summary judgment are granted to the extent they seek

dismissal of Socha's claims under the Section 200 "means and methods" standard.

      The Environmental Consultant Defendants present evidence that they did not

supervise or control Socha's daily work. *See, e.g.*, Declaration of John Cookson in Supp. of

Ambient Mot. for Summ. J., Exh. E at 54:1-6, 164:16-170:11. Rather, they argue that their role

was limited to providing oversight of the remediation work and testing the air and debris. *See,*

29

*e.g.*, Calabrese Decl., Exh. G at 52-55. Socha, however, points to evidence that, at each of the relevant buildings, the Environmental Consultant Defendants "exercised supervisory control over the means and method of the work" in that they played a significant role in the choice of respiratory equipment and safety procedures employed by the contractors that hired Socha to perform the clean-up work. For example, there is evidence that Ambient would approve or disapprove remediation procedures proposed by Structure Tone at 90 Church Street. *See, e.g.*, Joyce Aff., Exh. F at 152. Similarly, at 1 Liberty Plaza, Hillmann recommended subcontractors that employed "asbestos-abatement methodologies." Cannata Decl., Exh. 80 at 3. Merrill Lynch presents alleges that, at 2 World Financial Center, Weston advised it to "treat the cleanup as an asbestos abatement." Goldstein Decl., Exh. KK at 104-05. Thus, there is a question of fact as to whether the Environmental Consultant Defendants recommended the provision of respiratory equipment and procedures suitable for asbestos abatement and, if so, whether that recommendation was reasonable. Accordingly, the Environmental Consultant Defendants' motions for summary judgment are denied with respect to Socha's claims pursuant to section 200 of the New York Labor Law.

Structure Tone presents evidence that, while it ensured compliance with safety protocols, it did not exercise direct supervisory control over Socha's day-to-day work. *See* Joyce Aff., Exh. F at 46-47, Exh. G at 73, Exh. H at 54, 64, 78. However, there is evidence that Structure Tone helped to develop the safety and remediation protocol employed by subcontractors at 90 Church Street, *see* Leff Decl., Exh. K at 30-34; Cannata Decl., Exh. 177 at 10-12, and that it proposed the manner and method of Socha's work, *see* Joyce Aff., Exh. F at 152. Thus, Socha raises an issue of fact as to whether, and to what degree, Structure Tone

30

influenced the decision to utilize asbestos-specific equipment and practices, and whether that decision was reasonable. Accordingly, I deny Structure Tone's motion for summary judgment.

I deny BMS's motion for the same reason. Socha has presented evidence that while BMS supervised his work at 2 World Financial Center, replacement filters were unavailable and he was told respirators were not needed. *See* Cannata Decl., Exh. 53 at 170, Exh. 54 at 329. BMS argues that it cannot be liable because it did not have actual or constructive notice of the allegedly unsafe condition at 2 World Financial Center. *See* Reply Mem. of Law in Supp. of BMS Mot. for Summ. J. at 8. BMS, however, points to nothing in the record that supports this assertion. Accordingly, there are issues of fact as to what hazards BMS knew of, or should have known of, and whether they exercised reasonable supervision over the means and method of Socha's work.

## 2.     The "Premises Liability" Standard

Where a plaintiff's claim arises out of the condition of the premises, a party is liable if (1) it created the dangerous condition causing the injury or (2) failed to remedy a dangerous or defective condition of which he or she had actual or constructive notice. *See Ortega*, 57 A.D.3d at 61. However, a subcontractor's or employer's failure to provide adequate equipment does not create liability for a dangerous condition. *See Persichilli*, 16 N.Y.2d at 145; *Ortega*, 57 A.D.3d at 62 ("[A] subcontractor's failure to provide safe appliances does not render the 'premises' unsafe or defective."). A dangerous condition must be "visible and apparent" and "exist for a sufficient length of time prior to the accident" for an owner to be liable for failing to remedy such a condition. *Gordon v. Am. Museum of Natural History*, 67 N.Y.2d 836, 837 (1986). Furthermore, notice of generalized dangers, as opposed to the specific dangerous condition giving rise to the injury, is insufficient. *See Taylor v. United States*, 121 F.3d 86 (2d

31

Cir. 1997) (holding that notice that a door was "malfunctioning" was insufficient because the "infinite" number of ways a door may malfunction does not give defendant notice of the particular defect causing the injury).

    However, the statutory duty to maintain a reasonably safe workplace implies a duty to make timely and adequate inspections for dangers that may reasonably be discovered. *DiNunzio v. Ken-Jil Elec. Contractors, Inc.*, 473 F. Supp. 2d 485, 487 (S.D.N.Y 2007) ("A landowner is generally charged with constructive notice of the dangerous conditions which a reasonable inspection would have discovered because part of the landowner's duty to maintain their property is the duty to use reasonable care to inspect and repair the property."). Thus, constructive notice is imputed where a hazard exists for such a length of time that a defendant would have discovered it by conducting reasonable inspections. *Dufrain v. Hutchings*, 112 A.D.3d 1212, 1212 (3d Dep't 2013). The question of whether a defendant "has conducted reasonable inspections of the premises is usually a question of fact for the jury to resolve in determining whether defendants fulfilled their duty to maintain the premises in a reasonably safe condition." *Id.*; *see also In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1137-38 (2d Cir. 1995) (finding sufficient evidence that general contractor had constructive notice of risks of asbestos due to warning labels, state and federal regulations regarding asbestos, and general contractor's presence at safety meetings where asbestos was discussed). Where a defendant has actual or constructive notice of a dangerous condition, he or she must remedy the condition within a reasonable time, *see Eversfield v. Brush Hollow Realty*, LLC, 91 A.D.3d 814, 816 (2d Dep't 2012), and act reasonably when doing so, *see Rizzuto v. L.A. Wenger Constr. Co.*, 91 N.Y.2d 343, 351 (1998) (holding that the jury could reasonably find "that someone within the

chain of the construction project was negligent in not exercising reasonable care . . . to . . . remediate the hazard").

The Owner Defendants argue that they acted reasonably in remediating the dust and debris that penetrated their respective buildings. In support, they point to evidence that almost immediately after the September 11, 2001 attacks, they retained qualified environmental specialists to test the air and debris in their buildings. *See, e.g.*, Leff Decl., Exh. J at 29-30; Calabrese Decl., Exh. C ¶ 48; Smith Decl., Exh. C at 53-54; Goldstein Decl., Exh. O ¶ 5, Exh. F ¶ 9, Exh. K at 1; Cannata Decl., Exh. 80, Exh. 175. Over the ensuing weeks, the Owner Defendants allege that they continued to work with their respective environmental consultants to monitor the air quality.[6] *See, e.g.*, Leff Decl., Exh. H at 123:14-124:15.

In opposition, Socha presents evidence that the Owner Defendants either retained environmental consultants and contractors specifically to perform asbestos abatement and monitoring, *see, e.g.*, Cannata Decl., Exh. 80, Exh. 81, Exh. 86, Exh. 172; *see also, e.g.*, Cardo Decl., Exh. F at 34; Calabrese Decl., Exh. G at 82; Goldstein Decl., Exh. R, Exh. AA, or played some role in the decision to implement asbestos abatement procedures at the work sites, *see, e.g.*, Cannata Decl., Exh. 177 at 6, 10-12; *see also, e.g.*, Leff Decl., Exh. K at 30-34. It is true that certain Owner Defendants did not initially limit the scope of the consultants' work to asbestos testing and monitoring. *See, e.g.*, Goldstein Decl., Exh. W, Exh. GG; Savino Decl., Exh. E. However, on the record before me, I cannot hold as a matter of law that the Owner Defendants

---

[6] Several Owner Defendants also point to the September 14, 2001 letter from the NYC DEP requiring the implementation of asbestos abatement procedures to support their argument that they acted reasonably. *See, e.g.*, Goldstein Decl., Ex. D. However, there is nothing in the letter that prohibits the Owner Defendants from providing "powered air purifying respirators" or implementing other procedures that may have allegedly protected the workers from "high-alkaline" dust. Accordingly, while the letter may be evidence of reasonableness, it does not establish reasonableness as a matter of law.

played no role in the allegedly unreasonable decision to use asbestos-specific safety equipment and procedures.[7] *See, e.g.*, Cannata Decl., Exh. 152 at 16:18-24.

Socha also points to expert evidence that a reasonable inspection of the premises by the Owner Defendants would have revealed the presence of "high-alkaline" dust. *See* Cannata Decl., Exh. 8. Moreover, there is evidence that the Owner Defendants' focus on asbestos, and failure to test for, or appreciate the danger posed by, elevated pH levels in the dust, was unreasonable and lead to the provision of respiratory equipment that, while perhaps adequate for asbestos abatement, failed to protect Socha from dust characterized by "high alkalinity," large particulates, and high mass concentration.[8] *See id.* This is a subject that will be covered by experts each side plans to identify and discover in the next phase of the ligitation. Meanwhile, Socha has raised a genuine issue of fact as to whether the Owner Defendants had constructive knowledge of the presence of "high alkaline" dust and whether their remediation of that danger was unreasonable. Accordingly, I deny the Owner Defendants' motions for summary judgment, subject to renewal after discovery of relevant experts.

## E.    New York Labor Law Section 241(6)

Section 241(6) of the New York Labor Law provides that:

---

[7] Several Owner Defendants note that Socha does not specifically allege, with respect to his work in several buildings, that his filters clogged or that he inhaled the "high-alkaline" dust. However, Socha does present evidence that he wore "asbestos-specific" respiratory equipment, and that such equipment was inadequate to protect him from the "high-alkaline" dust. Defendants have failed to controvert such evidence with evidence that he was provided with "powered air purifying respirators" or that the equipment Socha did wear was, in fact, adequate to protect him from the "high-alkaline" dust.

[8] Several Owner Defendants rely on *Kagan v. BFP One Liberty Plaza*, 62 A.D.3d 531 (1st Dep't 2009), to argue that Socha may not rely on expert testimony that environmental testing was unreasonable where the expert did not conduct his or her own testing of the air. The case provides the Defendant Owners no support. In *Kagan*, the environmental consultants hired by the owners had tested the air at 1 Liberty Plaza and found all airborne toxins to be within acceptable levels. *See id.* at 532. Thus, the First Department held that the Defendant Owners discharged their duty of care by relying upon the environmental consultants. Here, by contrast, Socha presents evidence that, regardless of the test results, the Owner Defendants implemented abatement procedures that failed to protect the workers from the particular hazard present in the buildings. Furthermore, at this point, while the parties are in the midst of expert discovery, it is premature to rule on the dispositive legal effects of what experts might or might not testify.

34

> All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places. The commissioner may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work . . . shall comply therewith.

N.Y. Labor Law § 241(6) (McKinney 2014). These requirements apply to "[a]ll contractors and owners and their agents."[9] *Id.* § 241. The statute is intended to protect workers "engaged in duties connected to the inherently hazardous work of construction, excavation or demolition," *Nagel v. D & R Realty Corp.*, 99 N.Y.2d 98, 101 (2002), by imposing a non-delegable duty upon owners, general contractors, and their agents, to comply with the New York Industrial Code, *see Rizzuto*, 91 N.Y.2d at 348; *Morris v. Pavarini Constr.*, 22 N.Y.3d 668, 671 (2014). Thus, unlike section 200, section 241(6) imposes vicarious liability "*for the negligence of a subcontractor, even in the absence of control or supervision of the worksite*" and "without regard to [the owner, general contractor, or agent's] fault." *Rizzuto*, 91 N.Y.2d at 348-50. Further, a violation of an applicable Industrial Code violation does not establish negligence; rather, it is evidence of negligence to be considered by the jury. *See Long v. Forest-Fehlhaber*, 55 N.Y.2d 154, 159 (1982). If a jury finds that the violation constituted negligence, the owner, general contractor, and their statutory agents, are vicariously liable. *See Rizzuto*, 91 N.Y.2d at 348-50.

Accordingly, to prove vicarious liability under section 241(6), a plaintiff must demonstrate that (1) the work giving rise to the injury was "in connection with construction, excavation or demolition"; and (2) a violation of an applicable regulation implementing section 241(6) caused the plaintiff's injury. These requirements are addressed in turn.

### 1.   "Construction, Excavation or Demolition"

---

[9] As noted above, Socha has raised issues of fact as to whether the Environmental Consultants and BMS are statutory "agents" under the Labor Law.

Section 241(6) is limited to "industrial accidents specifically in connection with construction, demolition or excavation work." *Nagel*, 99 N.Y.2d at 102. The Courts look to the regulations implementing section 241(6) to determine what constitutes "construction, excavation or demolition." *Joblon v. Solow*, 91 N.Y.2d 457, 466 (1998). The New York Industrial Code defines "construction work" as:

> All work of the types performed in the *construction*, erection, *alteration, repair, maintenance*, painting or moving of buildings or other structures ... by way of illustration but not by way of limitation, the work of hoisting, land clearing, earth moving, grading, excavating, trenching, pipe and conduit laying, road and bridge construction, concreting, *cleaning of the exterior surfaces including windows of any building or other structure under construction*, equipment installation and the structural installation of wood, metal, glass, plastic, masonry and other building materials in any form or for any purpose.

N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.4(b)(13) (2014) (emphasis added). Socha argues that the work he performed constituted "altering" and "cleaning." *See* Pls.' Master Opp'n Br. at 42-68. The New York Court of Appeals has held that work will constitute "altering" within the definition of "construction work" so long as it constitutes a "significant physical change to the configuration or composition of the building." *Joblon v. Solow*, 91 N.Y.2d 457, 461 (1998). Similarly, "cleaning" may fall within the ambit of section 241(6) if the task is non-routine and connected to construction, excavation or demolition. *See, e.g.*, *Rivera v. Ambassador Fuel & Oil Burner Corp.*, 45 A.D.3d 275, 276 (1st Dep't 2007) ("The work performed by plaintiffs involved more than a simple cleaning of a fuel tank, and was part of a more comprehensive, overall contract for the installation of a new boiler. Based on these facts, it cannot be said, as a matter of law, that the cleaning of the tank was not related to construction.").

The New York Court of Appeals' decision in *Joblon v. Solow* is instructive. 91 N.Y.2d 457 (1998). In that case, the plaintiff was instructed to install an electronic wall clock in

36

a room lacking a power source. *See id.* at 461. To do so, the plaintiff chiseled a hole through a

wall leading to an adjacent room, from which to run wiring from a power source. *See id.* at 461-

62. While doing so, the plaintiff fell from a ladder and was injured. *See id.* at 462. The Court

held that, while a close question, the plaintiff's work constituted a "significant physical change to

the configuration and composition of the building." *Joblon*, 91 N.Y.2d at 465. Accordingly, the

Court held that the plaintiff's claims were covered by sections 240(1) and 241(6) of the New

York Labor Law. *See id.* at 466.

By contrast, routine maintenance work is not covered by the statute. *See, e.g.*,

*Nagel*, 99 N.Y.2d 98 (holding that routine safety inspection of elevator brakes did not fall within

the scope of section 241(6)); *Melski v. Fitzpatrick & Weller, Inc.*, 107 A.D.3d 1447, 1448 (4th

Dep't 2013) (holding that "replacing components that required replacement in the course of

normal wear and tear" was not covered as "construction, excavation or demolition"). Likewise,

cosmetic maintenance and decorative modifications fall outside the statute's scope. *See, e.g.*,

*Amendola v. Rheedlen 125th St., LLC*, 105 A.D.3d 426, 427 (1st Dep't 2013) (holding that the

installation of window shades, entailing the securing of brackets with screws, did not constitute a

"significant physical change"); *see also Munoz v. DJZ Realty, LLC*, 5 N.Y.3d 747 (2005)

(holding that plaintiff's work changing face of billboard was decorative rather than structural and

therefore fell outside scope of section 240(1)).

Notably, the particular task performed by a plaintiff need not constitute

"construction, excavation or demolition" so long as the task is sufficiently connected to a larger

project that qualifies as "construction, demolition, or excavation." *See McNeil v. La Salle

Partners*, 52 A.D.3d 407, 409 (1st Dep't 2008) ("Plaintiff's inspection of asbestos abatement

work during the construction phase of the Grand Central Terminal renovation project was

essential and integral to the progress of the construction, since the abatement work could not continue unless he gave his approval."); *see also Prats v. Port Authority of N.Y. & N.J.*, 100 N.Y.2d 878, 882 (2003) ("The intent of the statute was to protect workers employed in the enumerated acts, even while performing duties ancillary to those acts."). However, if the work is unrelated or insufficiently connected to any "construction, excavation or demolition," it is not covered under section 241(6). *See English v. City of New York*, 43 A.D.3d 811, 812-13 (2d Dep't 2007) (affirming grant of summary judgment on the ground that plaintiff's replacement of a missing component was unrelated to ongoing renovation work performed by subcontractor that did not employ plaintiff); *see also Martinez v. City of New York*, 93 N.Y.2d 322, 326 (1999) (holding that asbestos inspector's work was "investigatory" in nature and not related to the later phase of construction and, therefore, not within the ambit of section 240(1)).

With respect to 110-120 Church Street, 90 Church Street, and 2 World Financial Center, there is a triable issue of fact as to whether Socha's work was connected to "construction, excavation or demolition." 110-120 Church Street sustained substantial structural damage after the engine of Flight 175 struck the 16th floor, tearing a large whole in the exterior of the building. *See* Cardo Decl., Exh. F at 27-29. Similarly, 7 World Trade Center collapsed into the base of 90 Church Street, causing significant structural damage. *See* Leff Decl., Exh. J at 29-30. 2 World Financial Center suffered hundreds of broken windows, demolished walls, and the destruction of the "Winter Garden." *See* Goldstein Decl., Exh. DD; Cannata Decl., Exh. 139.

In each of these buildings, Socha was hired to perform the initial clean-up in a larger effort to remediate and rehabilitate the buildings for occupancy. The extent of damage alone is evidence that the work to which Socha's cleanup work was connected constituted alterations at least as significant as that in *Joblon*. Further, in each of these three buildings,

38

Pinnacle workers "demolished walls," removed drop ceilings, boarded up broken windows, and constructed structures to assist in the removal of debris. *See* Cannata Decl., Exh. 35 at 31, Exh. 59 at 557, Exh. 66 at 302-03; Joyce Aff., Exh. F at 36. At 90 Church Street, Socha himself "demolished rooms," Cannata Decl., Exh. 55 at 495-96, and, at 2 World Financial Center, he removed wall studs, *see* Cannata Decl., Exh. 53 at 227, 239, Exh. 54 at 352-53.

Defendants principally rely upon *Kagan v. BFP One Liberty Plaza*, 60 A.D.3d 531 (1st Dep't 2009), to argue that clean-up work after the 9/11 attacks cannot, as a matter of law, be considered "construction, excavation or demolition." The plaintiff in *Kagan*, however, was hired to perform "fine cleaning" and only began the work after the large-scale "bulk" and "environmental cleaning" was complete. *See* Cannata Decl., Exh. 188 at 8. Furthermore, Defendants point to no evidence that the building at issue in *Kagan*, 1 Liberty Plaza, sustained the degree of structural damage sustained by 110-120 Church Street, 90 Church Street, or 2 World Financial Center. Defendants point to no evidence that these three buildings did not require "construction," and there is insufficient evidence to determine, as a matter of law, whether Socha's work was "essential and integral" to any "construction" performed. *McNeil*, 52 A.D.3d at 409. Accordingly, I deny Defendants' motions for summary judgment under section 241(6) of the Labor Law with respect to these three buildings.

With respect to the remaining six buildings still at issue, however, Socha has failed to raise a triable issue of fact as to whether his work was connected to "construction, excavation, or demolition." None of these buildings sustained structural damage and, in most, the extent of the damage was limited to an infiltration of World Trade Center dust. *See* Cannata Decl., Exh. 19H, Exh. 18A, Exh. 20A, Exh. 41 at 62, Exh. 23B, Exh. 19G, Exh. 53 at 206-07, Exh. 54 at 51, 79, 290, 326; Goldstein Decl., Exh. LL at 102-03, Exh. R, Exh. MM at 187:19-

188:2; Harlbardier Decl., Exh. D at 6. The work performed to remediate these buildings

consisted exclusively of cleaning the dust and removing contaminated debris, tiles and sheetrock.

*See* Cannata Decl., Exh. 53 at 222; Exh. 17B, Exh. 18D, Exh. 18A, Exh. 19, Exh. 20A, Exh.

23B, Exh. 59 at 525, Exh. 53 at 217-18, 248, Exh. 49 at 132, Exh. 34 at 6, 44, 156; Goldstein

Decl., Exh. C at 267, Exh. II at 261:2-5, 228:11-20; Harlbardier Decl., Exh. G at 246:5-6; Savino

Decl., Exh. G at 309:21-310:1, 292:13-17, 300:1-7. Such work does not constitute a "significant

physical change to the configuration or composition" of the building. *See Joblon,* 91 N.Y.2d at

465; *Kagan*, 62 A.D.3d 531. Furthermore, the work performed at these buildings does not

present the degree of inherent risk against which the New York legislature sought to protect

workers by imposing vicarious liability on owners, general contractors, and their agents. *See*

*Nagel v. D & R Realty Corp.*, 99 N.Y.2d 98, 100-02 (2002) (discussing legislative history of

section 241(6)).

                 In opposition, Socha points to several cases interpreting the word "cleaning" in

the context of a similar statute, section 240(1)[10] of the Labor Law, which have held that non-

routine commercial cleaning may fall within the ambit of that statute. *See, e.g.*, *Collymore v.*

*1895 WWA, LLC*, 113 A.D.3d 720, 720-21 (2d Dep't 2014) (denying summary judgment where

plaintiff was hired to decontaminate HVAC ducts). However, there is a critical difference

between the way in which the term "cleaning" is used in section 240(1) and the way it is used in

section 241(6). Section 240(1) applies to all work involving "the erection, demolition, repairing,

altering, painting, *cleaning* or pointing *of a building or structure*." N.Y. Labor Law § 240(1)

(McKinney 2014) (emphasis added). By contrast, section 241(6) applies to "[a]ll areas in which

---

[10] Labor Law § 240(1) imposes a non-delegable duty upon owners, contractors, and their agents, to provide
reasonably safe devices necessary for workers subjected to elevation-related risks. *See Soto v. J. Crew Inc.*, 21
N.Y.3d 562, 566 (2013). To recover, a plaintiff must have been engaged in a covered activity—"the erection,
demolition, repairing, altering, painting, cleaning or pointing of a building or structure." N.Y. Labor Law § 240(1)
(McKinney 2014).

*construction, excavation or demolition* work is being performed." *Id.* § 241(6) (emphasis added). The term "cleaning" as it relates to section 241(6) is only found in the definition of "construction work" in the Industrial Code, which includes "*cleaning* of the exterior surfaces including windows of any building or other structure *under construction.*" N.Y. Comp. Codes R. & Regs., tit. 12, § 23-1.4(b)(13) (2014) (emphasis added). Thus, under section 241(6), "cleaning" must be related to "construction," *id.*; *see also Nagel*, 99 N.Y.2d at 103, whereas the statutory language of section 240(1) has no such requirement. *See* N.Y. Labor Law § 240(1) (McKinney 2014). This is logical because section 240(1) has an additional requirement that the work involve "elevation-related risks," *id.*, and, thus, both statutes require the work to be inherently hazardous for vicariously liability to attach. Accordingly, Socha's work at the above-listed six buildings does not constitute "cleaning" under section 241(6) because, as held above, it was not related to "construction." Accordingly, I grant Defendants' motions for summary judgment under section 241(6) of the Labor Law with respect to 1 Liberty Plaza, 1 World Financial Center, 4 World Financial Center, 222 Broadway, 61 Broadway, and 70 Pine Street.

## 2.    Violation of Applicable Industrial Code Provision

Liability under section 241(6) also requires proof of a violation of Part 23 of the New York Industrial Code, the regulations implementing section 241(6). *See Kaczmarek v. Bethlehem Steel Corp.*, 884 F. Supp. 768, 779 (W.D.N.Y. 1995); *Nostrom v. A.W. Chesterton Co.*, 59 A.D.3d 159 (1st Dep't 2009). It is insufficient to allege violations of OSHA regulations, *see Rizzuto*, 91 N.Y.2d at 351 n.1, or Part 12 of the New York Industrial Code, *see Kagan*, 62 A.D.3d at 532. Further, the provision of Part 23 alleged to have been violated must "mandate compliance with concrete specifications and not simply declare a general safety standard or reiterate common-law principles." *Misicki v. Caradonna*, 12 N.Y.3d 511, 515 (2009); *see also*

*Ross v. Curtis-Palmer Hydro-Elec. Co.*, 81 N.Y.2d 494, 505 (1993). The provision must add a "specific, positive command" beyond the duty of reasonableness imposed by the common law. *Ross*, 81 N.Y.2d at 504.

In deciding whether a Part 23 provision is applicable, "[t]he Industrial Code should be sensibly interpreted and applied to effectuate its purpose of protecting construction laborers against hazards in the workplace." *St. Louis v. Town of N. Elba*, 16 N.Y.3d 411, 416 (2011). Furthermore, the question of whether a particular Industrial Code provision is a proper basis for section 241(6) liability is a question of law. *See Messina v. City of New York*, 300 A.D.2d 121, 121 (1st Dep't 2002). Plaintiffs argue that their injuries were caused by violations of several applicable provisions of Part 23 of the Industrial Code. I address each in turn.

### (a)     Rule 23-1.5(c)(3)

Socha first alleges that a violation of Rule 23-1.5(c)(3) of the New York Industrial Code caused his injuries. *See* Pls.' Master Opp'n Br. at 78-83.[11] That Rule provides that " [a]ll safety devices, safeguards and equipment in use shall be kept sound and operable, *and shall be immediately repaired or restored or immediately removed from the job site if damaged.*" *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.5(c)(3) (2014) (emphasis added). Socha argues that the contractors hired by the Owner Defendants failed to "repair, replace or remove" clogged filters and respirators. Pls.' Master Opp'n Br. at 79.

In determining whether Rule 23-1.5(c)(3) is a sufficiently "concrete, positive" command, the New York Court of Appeals' decision in *Misicki v. Caraddona*, 12 N.Y.3d 511, is

---

[11] While Socha failed to allege a violation of this specific Industrial Code provision in the Master Complaint, his inclusion of the allegation in opposition to Defendants' summary judgment motions did not raise any new factual allegations or new theories of liability and, therefore, does not prejudice the Defendants. *See Klimowicz v. Powell Cove Assocs., LLC*, 111 A.D.3d 605, 606-07 (2d Dep't 2013).

instructive. In that case, the plaintiff's injury was allegedly caused by a violation of Rule 23-9.2(a), which provides, in relevant part:

> All power-operated equipment shall be maintained in good repair and in proper operating condition at all times. Sufficient inspections of adequate frequency shall be made of such equipment to insure such maintenance. *Upon discovery, any structural defect or unsafe condition in such equipment shall be corrected by necessary repairs or replacement.*

N.Y. Comp. Codes R. & Regs. tit. 12, § 23-9.2(a) (2014) (emphasis added). The Court held that the first two sentences were "not specific enough to permit recovery under section 241(6)" because they employed "general phrases" such as "good repair," "proper operating condition," "sufficient inspections," and "adequate frequency." *Misicki*, 12 N.Y.3d at 520. The third sentence, by contrast, "mandates a distinct standard of conduct, rather than a general reiteration of common-law principles, and is precisely the type of 'concrete specification'" sufficient to support a section 241(6) claim. *Id.* at 521.

Similarly, Rule 23-1.5(c), which requires that equipment be "immediately repaired or restored" and "immediately removed from the job site if damaged," is a sufficiently "concrete, positive" command to support Socha's section 241(6) claim. *See Pina v. Dora Homes, Inc.*, No. 09-cv-1626, 2013 WL 359386, at *6 (E.D.N.Y. Jan. 29, 2013) (holding that under *Misicki* a violation of Rule 23-1.5(c)(3) may support a section 241(6) claim). Socha presents evidence that inappropriate respirators and filters were used at the worksites and that his employers failed to repair or replace them with appropriate equipment. *See, e.g.*, Cannata Decl., Exh. 53 at 43, 170, 256-59, Exh. 54 at 329, 342. Because Defendants have failed to carry their burden that no issue of fact exists with respect to the alleged violation of Rule 23-1.5(c)(3), I deny their summary judgment motions.

### (b)    Rules 23-1.7(h) and 23-1.8(c)(4)

43

Socha also predicates his section 241(6) claims on violations of Rule 23-1.7(h) and Rule 23-1.8(c)(4). *See* Pls.' Master Opp'n Br. at 95-99. These provisions, which require that employers provide proper protective equipment to employees required to handle "corrosive substances," N.Y. Comp. Codes R. & Regs. tit. 12, §§ 23-1.7(h), 23-1.8(c)(4) (2014), have likewise been held sufficiently specific to support a section 241(6) claim. *See Creamer v. Amsterdam High Sch.*, 277 A.D.2d 647, 650 (3d Dep't 2000) (finding sufficient evidence to support jury's determination that defendant violated Rule 23-1.8(c)(4) resulting in vicarious liability under section 241(6)). Defendants argue that the provision is too general to support a section 241(6) claim and that the provision is inapplicable because Socha did not handle "corrosive substances" as that term is intended in the regulations. *See* Def.'s Owners Section 241(6) Master Br. at 13-14. However, Defendants cite no case law in support of the former position and no facts in support of the latter. *See id.* In contrast, while the Industrial Code does not define "corrosive substance," *see* N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.4 (2014), Socha has presented expert evidence that the "alkaline-based" dust could be considered a "corrosive substance." *See* Exh. 8 at 7. This too is a subject that will be covered by experts each side plans to identify and discover in the next phase of the ligitation. *See Morris v. Pavarini Constr.*, 9 N.Y.3d 47, 51 (2007) ("[T]he meaning of specialized terms in such a regulation is a question on which a court must sometimes hear evidence before making its determination."). Meanwhile, Defendants have failed to satisfy their burden that, as a matter of law, Socha cannot predicate his section 241(6) claims upon a violation of Rules 23-1.7(h) and 23-1.8(c)(4).

### (c)   **Rule 23-1.8(b)(1)**

Next, Socha argues that the contractors violated Rule 23-1.8(b)(1), which provides:

44

> Where this Part (rule) requires a respirator to be provided, the employer shall furnish and the employee shall use an approved respirator. Such respirator shall be approved for the type of operation for which it is to be used and for the particular air contaminant present. The employer shall maintain such respirator in good repair and shall furnish the means for its continued proper working condition. The employer shall provide daily inspection and cleaning and weekly disinfecting of such respirators. Respirators shall be disinfected before being transferred from one person to another. When not in use, respirators shall be stored in closed containers.

N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.8(b)(1) (2014). Socha argues that the contractors hired by the Owner Defendants violated this regulation by (1) not providing respirators designed for "the particular air contaminant present," (2) not providing the "means for [the respirators'] continued proper working condition" once the respirator filters became clogged, and (3) failing to daily, or at appropriate intervals, inspect and clean the respirators. *See* Pls.' Master Opp'n Br. at 100.  Defendants argue that Rule 23-1.8(b)(1) consists of "general guidelines" insufficient to support a section 241(6) claim. *See* Def.'s Owners Section 241(6) Master Br. at 13.  However, New York courts have held Rule 23-1.8(b)(1) sufficiently specific and upheld section 241(6) claims predicated upon its violation. *See Kebbeh v. City of New York*, 113 A.D.3d 512, 513 (1st Dep't 2014) ("The motion court also correctly denied defendants' motion for summary judgment dismissing plaintiff's Labor Law § 241(6) claim alleging violations of 12 NYCRR 23-1.8 (b).").[12]  Furthermore, Socha has presented evidence that inappropriate respiratory equipment was used at the worksites. *See, e.g.*, Cannata Decl., Exh. 53 at 43, 170, 256-59, Exh. 54 at 329, 342.  Accordingly, Defendants have failed to show that, as a matter of law, Socha cannot base his section 241(6) claim upon a violation of Rule 23-1.8(b).

---

[12] Defendants reliance on *Mouta v. Essex Mkt. Dev. LLC*, 106 A.D.3d 549 (1st Dep't 2013) for the proposition that Rule 23-1.8(b)(1) is too general to support a section 241(6) claim is misplaced. In that case, the First Department held that "[t]o the extent the Labor Law § 241(6) claim is predicated on Industrial Code (12 NYCRR) § . . . 23-1.8 . . ., it must be dismissed as against all defendants because these provisions *either are too general to support a section 241(6) claim or are simply inapplicable to the facts of this case*." *Id.* at 550. Since its decision in *Mouta*, the First Department has held that Rule 23-1.8(b)(1) is sufficiently specific to support a section 241(6) claim. *See Kebbeh*, 113 A.D.3d at 513.

**(d)     Rule 23-2.1(b)**

Socha also predicates section 241(6) liability upon a violation of Rule 23-2.1(b),

which provides that "[d]ebris shall be handled and disposed of by methods that will not endanger

any person employed in the area of such disposal or any person lawfully frequenting such area."

N.Y. Comp. Codes R. & Regs. tit. 12, § 23-2.1(b) (2014).  However, this provision adds nothing

specific to the common law duty of reasonable care and, therefore, fails to satisfy the

requirements provided by the New York Court of Appeals in *Misicki*.  Several New York Courts

have specifically held that the provision cannot support a section 241(6) claim.  *See, e.g.*, *Long v.*

*Long Island R.R.*, 116 A.D.3d 676, 677 (2d Dep't 2014); *Gonzelez v.  Glenwood Mason Supply*

*Co.*, 41 A.D.3d 338, 339 (1st Dep't 2011).  Accordingly, as a matter of law, Socha may not

predicate his section 241(6) claims upon a violation of Rule 23-2.1(b) and I grant Defendants'

motions in this respect.

**(e)     Rule 23-1.7(g)**

Finally, Socha alleges that his injuries were caused by a violation of Rule 23-

1.7(g).  That regulation provides:

> The atmosphere of any unventilated confined area including but not
> limited to a sewer, pit, tank or chimney where dangerous air
> contaminants may be present or where there may not be sufficient
> oxygen to support life shall be tested by the employer, his authorized
> agent or by a designated person before any person is suffered or
> permitted to work in such area. Such testing shall be in accordance with
> the provisions of Industrial Code Part (rule) 12 relating to the "Control of
> Air Contaminants" and such areas shall be subject to the other pertinent
> provisions of Industrial Code Part (rule) 12 and of Industrial Code Part
> (rule) 18 relating to "Exhaust Systems."

N.Y. Comp. Codes R. & Regs. tit. 12, § 23-1.7(g) (2014).  Defendants do not argue that the

provision is insufficiently specific to support a section 241(6) claim.  Rather, they contend that

Socha has failed to present evidence that he performed any work in an "unventilated confined area." *See* Defs.' Owners Section 241(6) Master Br. at 15-18.

While Part 23 of the Industrial Code does not define "unventilated confined area," Part 12 defines "unventilated confined space" as:

> A tank, vault or similar enclosed structure or space with restricted means of egress, such as a manhole or trap door, which is so enclosed and of such volume that natural ventilation through openings provided will not prevent the accumulation of dangerous air contaminants nor supply sufficient oxygen to protect the life, health and safety of any person occupying such structure or space.

N.Y. Comp. Codes R. & Regs. tit. 12, § 12-1.3(f) (2014). Applying this definition, the court in *Kaczmarek v. Bethlehem Steel Corp.* held that a room with two large doors and ventilating fans did not constitute an "unventilated confined space" so as to support a section 241(6) claim. 884 F. Supp. 768, 779-80 (W.D.N.Y. 1995). Similarly, in *Kagan*, the First Department held that workers cleaning offices after the 9/11 attacks were not working in an "unventilated confined space." 62 A.D.3d at 532. By contrast, New York courts have considered an empty aeration tank with a small opening near the top to be an "unventilated confined space." *See Ceverizzo v. City of New York*, 116 A.D.3d 469, 470-71 (1st Dep't 2014).

With respect to 90 Church Street, Socha has failed to point to any evidence whatsoever that he performed work in a "confined, unventilated area" as New York courts have interpreted that term. With respect to 2 World Financial Center and 110-120 Church Street, he alleges that he worked inside small rooms, and basements, and cleaned inside HVAC ducts. *See* Cannata Decl., Exh. 53 at 207, 237, 239-41, Exh. 54 at 290-92, 352-53, 356-67. However, he points to no facts that such areas were "enclosed" or that he had "restricted means of egress," as required to be considered a "confined, unventilated area" as that term has been interpreted by New York courts. N.Y. Comp. Codes R. & Regs. tit. 12, §§ 12-1.3(f), 23-1.7(g) (2014)

(McKinney 2014); *Ceverizzo*, 116 A.D.3d at 470-71; *Kagan*, 62 A.D.3d at 532. Accordingly, I hold that Socha cannot predicate his section 241(6) claim on a violation of Part 23-1.7(g) and grant Defendants' motions in this respect.

## IV. Conclusion

In summary, the motion filed by environmental consultant Indoor Environmental Technologies, Inc. is GRANTED in its entirety with respect Socha's claims under both section 200 and section 241(6) of the New York Labor Law, arising from his work at 100 Church Street and 2 World Financial Center.

The motion filed by Owner Defendants Boston Properties, Inc. and 90 Church Street, L.P. are DENIED with respect Socha's section 200 claim and section 241(6) claim alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1), arising from his work at 90 Church Street. The motion is GRANTED with respect to Socha's section 241(6) claim alleging violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g).

The motion filed by Owner Defendants 110 Church, LLC and Lionshead 110 Development LLC is DENIED with respect to Socha's section 200 claim and section 241(6) claim alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1), arising from his work at 110-120 Church Street. The motion is GRANTED with respect to Socha's section 241(6) claim alleging violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g).

The motion filed by Owner Defendants Battery Park City Authority, Merrill Lynch & Co., Inc., and 222 Broadway LLC is DENIED with respect to Socha's section 200 claim, arising from Socha's work at 2 World Financial Center, 4 World Financial Center, and

222 Broadway.  The motion is DENIED with respect to Socha's section 241(6) claim arising from his work at 2 World Financial Center, alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1), and GRANTED with respect to alleged violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g).  The motion is GRANTED with respect to Socha's section 241(6) claim, arising from his work at 4 World Financial Center and 222 Broadway.

The motion filed by Owner Defendants Crown 61 Associates, LP, Crown 61 Corp., Crown Broadway LLC, and Crown Properties, Inc., is DENIED with respect to Socha's section 200 claim and GRANTED with respect Socha's section 241(6) claim, arising from his work at 61 Broadway.

The motion filed by Owner Defendants American International Realty Corp. and American International Realty Group is DENIED with respect to Socha's section 200 claim and GRANTED with respect Socha's section 241(6) claim, arising from his work at 70 Pine Street.

The motion filed by Owner Defendants Brookfield Financial Properties Inc., Brookfield Financial Properties, L.P., Brookfield Properties OLP Co. LLC, and Brookfield Properties One WFC G.P. Corp. is DENIED with respect to Socha's section 200 claim, and GRANTED with respect Socha's section 241(6) claim, arising from his work at 1 World Financial Center and 1 Liberty Plaza.

The motion filed by Environmental Consultant Defendant Ambient Group, Inc. is DENIED with respect to Socha's section 200 claim, DENIED with respect to Socha's section 241(6) claim alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1), and GRANTED with respect to alleged violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g), arising from his work at 90 Church Street.

49

The motion filed by Environmental Consultant Defendant Hillmann Environmental Group, Inc. is DENIED with respect to Socha's section 200 claim arising from his work at 1 Liberty Plaza, 1 World Financial Center, and 2 World Financial Center. The motion is GRANTED with respect to Socha's section 241(6) claim arising from his work at 1 Liberty Plaza and 1 World Financial Center. The motion is DENIED with respect to Socha's section 241(6) claim alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1), and GRANTED with respect to alleged violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g), arising from his work at 2 World Financial Center.

The motion filed by Environmental Consultant Defendant Weston Solutions, Inc. is DENIED with respect to Socha's section 200 claim arising from his work at 222 Broadway, 2 World Financial Center, and 4 World Financial Center. The motion is GRANTED with respect to Socha's section 241(6) claim arising from his work at 222 Broadway and 4 World Financial Center. The motion is DENIED with respect to Socha's section 241(6) claim alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1), and GRANTED with respect to alleged violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g), arising from his work at 2 World Financial Center.

The motion filed by Structure Tone, Inc. is DENIED with respect to Socha's Section 200 claim arising from his work at 90 Church Street. The motion is DENIED with respect to Socha's section 241(6) claim alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1), and GRANTED with respect to alleged violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g).

The motion filed by Blackmon-Mooring Steamatic Catastrophe, Inc. is DENIED with respect to Socha's Section 200 claim arising from his work at 2 World Financial Center.

50

The motion is DENIED with respect to Socha's section 241(6) claim alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1), and GRANTED with respect to alleged violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g).

   The Clerk shall mark the following motions in No. 09-cv-00680 as terminated: Doc. No. 73, Doc. No. 80, Doc. No. 84, Doc. No. 90, Doc. No. 94, Doc. No. 98, Doc. No. 106, Doc. No. 109, Doc. No. 115, Doc.   No. 120, Doc. No. 133, and Doc. No. 143.

SO ORDERED.

Dated:  New York, New York
   September 9, 2014     ALVIN K. HELLERSTEIN
               United States District Judge